**L & F PRODUCTS, A DIVISION OF STERLING WINTHROP, INC., Plaintiff,**

v.

**The PROCTER & GAMBLE COMPANY, Defendant.**

**No. 93 Civ. 5726 (CHT).**

United States District Court,
S.D. New York.

Feb. 24, 1994.

Hall, Dickler, Lawler, Kent & Friedman, New York City (James E. Daniels, Jeffrey Edelstein, Justin Walker, of counsel), L & F Products, Montvale, NJ (Melissa Young, of counsel), for plaintiff.

Kramer, Levin, Naftalis, Nessen, Kamin & Frankel, New York City, William Stanley Morton, Procter & Gamble, Cincinnati, OH (Harold P. Weinberger, Mark Headley, of counsel), for defendant.

## OPINION AND ORDER

TENNEY, District Judge.

Plaintiff L & F Products ("L & F"), manufacturer of Lysol brand cleaning products, brings this suit against defendant Procter & Gamble Co. ("P & G"), manufacturer of Spic and Span brand cleaning products, regarding a current Spic and Span television advertising campaign involving three commercials. L & F claims that the commercials are false and misleading within the meaning of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and constitute unfair trade practices under New York General Business Laws §§ 349–350 and common law unfair competition. L & F seeks: (1) an injunction against further broadcasts of the commercials, (2) an order that P & G broadcast corrective advertising, and (3) further proceedings to determine monetary damages.

L & F challenges three separate commercials for Spic and Span brand cleaners. Saatchi & Saatchi, Spic and Span's advertising agency, developed these three advertisements together, and they each share common themes, style, and methods of presentation. Each commercial shows a Spic and Span cleaner used side by side with an unidentified cleaner on identical dirty household surfaces. Following the cleaning, the surfaces cleaned by Spic and Span and by the unidentified competing product both appear clean. The commercials then show some form of white fabric being rubbed against the "cleaned" surfaces. Each commercial ends by showing that the fabric rubbed over the surface cleaned with Spic and Span retains its bright white color, but the fabric rubbed over the surface cleaned with the competing product has become dirty. The commercials are almost entirely visual in content, with only a very brief spoken voiceover at the conclusion of each commercial.

L & F claims that the commercials unfairly portray the cleaning effectiveness of Lysol Basin Tub and Tile Cleaner and Lysol Deodorizing Cleaner through "false images" and "sham demonstrations." Pl. Pretrial Br. at 3. L & F also alleges that the commercials present a false claim that Spic and Span products clean bathroom soap scum and hard water stains better than the Lysol cleaners, and that the commercials present a false and misleading claim that the Lysol cleaners "do not clean bathroom surfaces at all or at most hardly at all." Complaint ¶¶ 16–17.

All damage claims have been bifurcated from the current claims for injunctive and other equitable relief. Joint Pre–Trial Order ("JPTO"), Undisputed Facts ¶ 7. The case was originally before Judge Cedarbaum, who presided over pretrial matters. Judge Cedarbaum transferred the case to these chambers on October 27, 1993. The court held a bench trial on November 15–18, 1993, and received extensive pretrial and posttrial briefs from each party.

The court finds that the advertisements are not false or misleading within the meaning of § 43(a) of the Lanham Act and do not constitute state or common law unfair competition, and dismisses L & F's complaint.

## FACTS

### 1. The Commercials

The first commercial, which this opinion will refer to as the "Socks in the Shower" commercial, advertises Spic and Span Basin, Tub and Tile Cleaner. The commercial takes

place in a large all-white room containing only two dirty bathtubs and two seated women. Accompanying music plays in the background. Two custodians enter. The custodian on the right holds a bottle of Spic and Span Basin, Tub and Tile Cleaner, while the custodian on the left holds a bottle of an unidentified cleaner. They each spray some of their cleaners onto the surface of their respective tubs, and then wipe the surface with a sponge. Only one wipe is shown on each surface. The commercials cut to a shot of the custodians after finishing the job, as they nod at each other and leave the area. The women, wearing white socks and no shoes, step into the tubs to each hang a shower curtain. After walking inside their respective tubs and hanging the curtains, the women step out of the tubs. A voice-over then states: "It's curtains for other bathroom sprays." The women display their socks side by side. The woman who stepped into the Spic and Span tub wears an unstained white sock. The woman who stepped into the tub cleaned with the other cleaner wears a sock now darkened with dirt. The voiceover continues: "Introducing new Basin, Tub and Tile Spray from Spic and Span." The commercial ends with a final product shot of Spic and Span Basin, Tub and Tile Cleaner. Pl.Exh. 2.

The second commercial, which this opinion will refer to as the "Towels in the Steam Bath" commercial, uses a nearly identical setting and the same accompanying music as "Socks in the Shower." The commercial opens in another all-white room, empty except for the presence of two enclosed, tiled shower stalls with seats. A custodian stands in front of each shower stall. The custodian standing on the right holds a bottle of Spic and Span Bathroom Cleaner, while the custodian on the left holds a bottle of an unidentified cleaner. They enter the dirty shower stalls, apply their respective cleaners to sponges, and begin cleaning. Only one wipe of the sponge is shown in each stall. The commercial cuts to the custodians having finished the job. They leave the stalls, nod at each other, and leave the scene. Two men, clad only in bathtowels, then enter the stalls, one in each stall. They sit reading newspapers in the stalls while steam rises. A close-

up shows each man's rear moving along the seat in the stall. The men leave the stalls and display their towels. The towel on the rear end of the man who was in the stall cleaned with Spic and Span is a clean white, while the towel of the man who was in the stall cleaned with the unidentified cleaner is now stained. A voiceover states: "Get the dirt that other bathroom cleaners can leave behind. Introducing new Bathroom Liquid from Spic and Span." A shot of the Spic and Span logo concludes the commercial. Pl. Exh. 2.

The third commercial, which this opinion will refer to as the "Gloves on the Bathroom Floor" commercial, begins in another all-white room with the same type of background music as the other commercials. Two custodians stand in the room on separate sections of a dirty white hard floor surface. The custodian on the left is almost twice the height of the custodian on the right. The custodian on the right holds Ultra Spic and Span cleansing powder, and the custodian on the left holds a bottle of an unidentified liquid cleaner. They begin to clean, mopping the floor many times. A voiceover states: "Unlike liquid cleaners, one little scoop of new Ultra Spic and Span cuts dirt down to size.... And costs less every time." The custodians then put on white gloves and wipe their gloves on their respective floors. The glove that wiped the side cleaned with Spic and Span is a clean white, while the glove that wiped the side cleaned by the competitor is stained. The commercial concludes with a product shot of Ultra Spic and Span and a voiceover—"After all, it's not clean until it's cleaned with Spic and Span." Pl.Exh. 2.

"Socks in the Shower" and "Towels in the Steam Bath" currently air on national network and cable television and in local spot markets. JPTO, Undisputed Facts ¶ 6. "Gloves on the Bathroom Floor" has been aired only in a test market in Boise, Idaho, and has not aired nationally. *Id.*

### 2. *The Products*

Bathroom cleaning products face many tasks. However, one of the most important

tasks of any bathroom cleaner is combating the scourge known as soap scum—the chalky buildup on tubs and basins. The commercials focus on the relative effectiveness of the cleaners against this common enemy.

P & G formulated Spic and Span Basin, Tub and Tile Cleaner and Spic and Span Bathroom Cleaner specifically to address the problem of bathroom soap scum and hard water stains. These two products utilize the same chemical formulation. Trial Transcript ("Tr.") 514–15. Spic and Span Basin, Tub and Tile Cleaner is a liquid dispensed as a spray, while Spic and Span Bathroom Cleaner is a liquid poured directly from the bottle. Ultra Spic and Span is a powder designed to clean hard floor surfaces throughout the home.

The chemical formulation of Lysol Deodorizing Cleaner differs fundamentally from the chemical formulation of Spic and Span Basin, Tub and Tile Cleaner and Spic and Span Bathroom Cleaner. Tr. 225. Lysol Deodorizing Cleaner is an all-purpose cleaner, frequently used in the bathroom. Tr. 29. Lysol Deodorizing Cleaner dates from the mid–1960's, when it was specifically formulated to disinfect, and L & F recently reformulated Lysol Deodorizing Cleaner to be more effective against soap scum. Tr. 29–34. Lysol has also introduced Lysol Basin Tub and Tile Cleaner, a product specifically formulated to remove soap scum and mineral deposits from household surfaces. Tr. 41.

P & G does not dispute L & F's claim that the commercials used Lysol Deodorizing Cleaner as the competing product. The "competitor" bottle used in the commercials is in the shape of the Lysol bottle; the competitor bottle used in the commercials contained Lysol Deodorizing Cleaner; Lysol was used to clean in the commercials; and Spic and Span's documents discuss using a Lysol lookalike in the commercials. P & G's presentation at trial and in its briefs did not dispute Lysol's standing to bring this suit on the basis of the fact that the commercials did not mention Lysol by name or depict the Lysol logo.

### 3. *Production of the Commercials*

The commercials display the results of off-screen cleaning competitions between Spic and Span and a competing cleaner. L & F claims that P & G's technicians and actors performed these competitions in an unfair manner. Two aspects of the production of the commercials are relevant to plaintiff's claim: the fairness of the procedures used by the production team during the cleaning competitions and the performance of the various "white glove tests" by the actors.

P & G's method of applying soap scum stains and achieving a realistic tenacity precluded applying the soap scum to an entire bathtub or shower stall. Instead, P & G applied the stains to porcelain templates, and then placed the templates in the tubs and showers shown in the commercial. Tr. 86. Technicians cleaned the templates (and the floor shown in the "White Gloves on the Bathroom Floor" commercial) in the studio.

Plaintiff failed to introduce persuasive evidence that the technicians used more effort while cleaning with Spic and Span than used while cleaning with Lysol. L & F stipulated that the film production crew used equal cleaning effort on the Spic and Span and competitor sides in the tubs shown in the Socks in the Shower commercial and on the floor surfaces shown in the Gloves on Bathroom Floor commercials. Tr. 126–28. Plaintiff produced no persuasive evidence that the technicians used unequal effort while cleaning the surfaces in the Towels in the Steam Bath commercial.

In addition, plaintiff failed to persuade the court that the actors performed any of the white glove tests in a deceptive or misleading manner. Our analysis of the issue is greatly facilitated in this case by the fact that P & G videotaped the processes involved in filming these commercials. As a result, the actual white glove tests performed between the products, although not appearing in the thirty second commercials shown to consumers, were available for the court to review. The availability of visual and audio records of the production of the commercials greatly assists the court's ability to determine the fairness of the product demonstrations, and helps establish P & G's good faith.

The videotapes of the white glove tests used in the Socks in the Shower commercial and in the Gloves on the Bathroom Floor commercial do not indicate any disparity of effort. The Towels in the Steam Bath commercial presents a closer question. The videotape of the two actors rubbing their towels on the seats of their respective steam baths indicates that the two actors appear to rub with different motions. However, the court is not satisfied by a preponderance of the evidence that these different cleaning motions would cause a meaningful disparity either in cleaning effort or in the quantity of soap scum residue picked up by the towels.

### 4. The Relative Cleaning Effectiveness of the Products

L & F responds to Spic and Span's claim of product superiority with its own laboratory tests.[1] Plaintiff claims that these tests demonstrate parity between the Lysol and Spic and Span cleaners against bathroom soap scum. However, the laboratory conditions and test methodology used by L & F differ from those used in P & G's laboratory tests in three material aspects: (A) The soap scum soil composition used by L & F does not include components used by P & G; (B) L & F does not bake the soap scum composition onto the surface to be cleaned, a procedure used by P & G; and (C) L & F's procedure for cleaning a surface and grading its cleanliness does not adequately allow competing cleaners to demonstrate that they are more effective than Lysol.

### A. The Composition of Soap Scum

■ In their respective tests comparing the relative cleaning effectiveness of Lysol and Spic and Span bathroom cleaners, the two manufacturers utilize different compositions of soap scum. Soap scum forms through the chemical reaction of soap with hard water, creating a calcium stearate precipitate that adheres to bathroom surfaces. Testimony established that the precise composition of soap scum actually found in American homes may vary widely. Tr. 234–35. In fact, the composition of soap scum stains found in the bottom of a bathtub may even vary from the composition of soap scum stains found along the sides of the tub.

Both P & G and L & F have expended substantial resources to formulate laboratory soap scum compositions that they believe are realistic substitutes for actual in-home soap scum. These efforts have led P & G and L & F to arrive at different conclusions. As a result, the laboratory soap scum composition used by Spic and Span to test cleaning effectiveness (and used in the commercials) differs substantially from the composition used by Lysol.

The fact that competitors use different laboratory soap scum compositions is understandable given the variations found in actual in-home soap scum. As L & F's own witness agreed, there is no single "typical" bathroom soil or soap scum stain, and there is professional disagreement as to the most representative composition for soap scum stains. Tr. 256–58, 290–91.

P & G satisfied the court that it made its choice of a laboratory soap scum composition on a well-founded, highly reliable and accurate scientific basis, and that this choice was not made for any deceptive purpose.[2] Several P & G employees testified in support of the soil composition used in the commercials. The court found these witnesses highly credible. These witnesses discussed the tests relied upon by P & G to analyze actual in-home soap scum stains, P & G's development of its laboratory soap scum, and P & G's efforts to confirm the laboratory findings with in-home tests. P & G's witnesses and documentary evidence satisfied the court that Spic and Span's soap scum composition is representa-

1. L & F did not perform tests comparing Lysol cleaners with the Ultra Spic and Span floor cleaner advertised in the White Gloves on the Bathroom Floor commercial. Tr. 227–28.

2. P & G claims that the precise chemical composition of its laboratory soap scum constitutes a trade secret. The testimony and evidence related to P & G's soap scum composition was filed under seal, and L & F has not disputed the confidential nature of this evidence for the purposes of this litigation. As a result, this opinion will not discuss the precise chemical composition of P & G's laboratory soap scum, nor will it discuss P & G's scientific basis for this composition.

tive of actual in-home soap scum, and that P & G has a well-founded scientific basis for the particular formulation chosen for the product comparisons.

### B. Baking Soap Scum Onto the Surfaces to be Cleaned

■ In addition to using a different soap scum composition, L & F's method for simulating the tenacity of bathroom soap scum differs from Spic and Span's method. The method of applying a soap scum composition to the surface to be cleaned substantially affects the tenacity of the soap scum composition. Spic and Span chooses to simulate the tenacity of bathroom stains by baking the soil composition onto the surface to be cleaned.[3] L & F's procedures for testing the effectiveness of soap scum do not bake the soap scum onto the surface. Instead, L & F applies the soap scum formulation to the surface, then allows it to dry and cure. Tr. 206, 213–14.

Testimony indicated that L & F's procedure produces a soap scum composition easier to clean than Spic and Span's baked-on composition. L & F's own witness acknowledged that baking increases the tenacity of the soap scum. Tr. 214–15.

P & G introduced persuasive evidence that its method of baking the soil is a realistic method of reproducing the tenacity and consistency of real-life bathroom soil. Guidelines for evaluating performance of ceramic tile cleaners proposed by the American Society for Testing and Materials (ASTM) support P & G's argument and advocate baking soap scum to simulate aged tile stains. Tr. 248–49, 291–93. These proposed guidelines were developed by a neutral body, and were not developed either in connection with this litigation or in relation to the development of the products at issue in this case. Another organization, the Chemical Specialties Manufacturers Association, is evaluating a proposal by chemical manufacturers that laboratories use baking as part of the test methodology of hard surface tile cleaners. Tr. 249–53. Although P & G bakes its soap scum composition at a higher temperature than that

mentioned in the ASTM guidelines, L & F failed to demonstrate that baking at this higher temperature creates an unrealistically tenacious composition.

L & F failed to convince the court that baking soap scum is a misleading method of simulating tenacity. As recently as 1991, L & F had baked its soap scum onto tiles, and last year one of their scientists developed a method for baking soap scum and advocated using it as a means of simulating tenacity. Def.Exh. X; Tr. 246–47. L & F's soil composition expert admitted that, in dealing with other clients, he accepted heating as an option for aging and increasing the tenacity of soil compositions. Tr. 312.

Finally, the court notes that L & F's product testing witness testified that L & F considers soap scum to be too tenacious for use in the laboratory if more than six to eight strokes of Lysol Basin Tub and Tile cleaner is required to remove the stain. Tr. 217, 238. This method would not allow L & F's tests to discover competing products that clean more tenacious stains than Lysol does.

Based on this evidence, the court finds that P & G's method of baking the soil composition provided a realistic facsimile of the tenacity of in-home soap scum stains. L & F's method also appears to provide a composition within the range of realistic tenacity. However, the court finds that L & F's method of applying the soap scum composition creates a lower tenacity to the soil, which affects the probative weight accorded L & F's tests in support of its claim of product parity.

### C. The Methodology for Grading Cleanliness

■ Plaintiff's witness testified that L & F's tests asked individuals to grade the cleanliness of the tiles only *after* Lysol products completed cleaning. Tr. 238–39. There was no method for the graders to determine whether the competing product had cleaned the surfaces in fewer strokes than Lysol required. *Id.* The court fails to see how this test could provide Lysol with anything less than parity. Combined with the fact

---

**3.** Unlike the other two commercials, the soil in the Gloves on the Bathroom Floor commercial

was not baked onto the surfaces cleaned. Tr. 126–27.

that L & F used only stains with a tenacity that would be cleaned in less than eight strokes of Lysol, L & F's tests fail to convince the court that Lysol is as effective a cleaner as Spic and Span.

P & G produced evidence that the formula used in the Spic and Span products cleans better than the Lysol formula. Tr. 534–46. The evidence was convincing, and included testimony regarding previous P & G laboratory and in-home consumer tests, exhibits, and in-court demonstrations. Tr. 534–65. However, the court is careful in assigning too much probative value to tests performed by P & G personnel in P & G labs with P & G employees used as graders of cleanliness.

Since P & G's tests lacked independent controls, the tests did not convince the court that, empirically, Spic and Span Basin, Tub and Tile Cleaner and Bathroom Cleaner clean better than the Lysol cleaners on a wide variety of surfaces and conditions. However, when weighed against the tests introduced by L & F, the preponderance of the evidence introduced at trial more than satisfies the court that the Spic and Span cleaners clean better than the Lysol cleaners on the soil composition used by P & G and under the test conditions used by P & G. The court further finds the soil composition and other conditions chosen by P & G for its laboratory tests and the production of the commercial to be a reasonable facsimile of actual in-home soap scum and cleaning conditions.

5. *Allegedly False, Misleading or Deceptive Devices Used in the Commercials*

■ The soap scum composition used in the commercials contained a minute amount of carbon black, a dark pigment. Carbon black is a commonly used pigment, found in the workplace and in the household in newsprint, photocopies, tires and many other items. L & F claims that the inclusion of carbon black in the soil composition makes the commercials misleading.

The head of L & F's household products division acknowledged that soap scum can contain particulate matter, including carbon black, and that household soap scum can be grey in color. As stated previously, L & F's

soil composition expert conceded that there is professional disagreement as to the most representative composition for soap scum stains. Tr. 290–91. The ASTM suggests including carbon black in the soil composition for soap scum stains. Tr. 290–91, 298. L & F's soil composition expert conceded that, despite L & F's presence within ASTM, there was no dispute within ASTM that use of carbon black in such soil was permissible. Tr. 309–13; Def.Exh.AJ.

Plaintiff's expert on carbon black, Mr. Avrom Medalia, testified that carbon black may react on the molecular level with other chemicals present in bathroom soap scum. Tr. 330–35. However, this testimony did not persuade the court that the presence of carbon black in bathroom soil would alter the results of the cleaning demonstrations shown in the commercial. Mr. Medalia has considerable expertise in carbon black. However, he had little familiarity with the chemical composition and properties of Spic and Span, Lysol, other surface cleaners, and soap scum. Tr. 340–45, 355. He therefore could only infer possible reactions between bathroom cleaners, soap scum and small amounts of carbon black.

P & G introduced the testimony of its Senior Engineer for Product Development, who provided evidence regarding P & G's own laboratory tests indicating that carbon black had a negligible effect on the relative cleaning abilities of Spic and Span and Lysol. Tr. 565–75, 595. Certain aspects of these tests are imperfect. However, when weighed against L & F's speculative claim that reactions with carbon black on the molecular level somehow skewed the tests against Lysol, these tests satisfy the court by a great preponderance of the evidence that the presence of the carbon black did not cause an unfair chemical change in the soil composition biasing the demonstrations against Lysol.

Particularly given the small quantity of carbon black used in the composition (the dried soil composition used in P & G's tests contained one part of carbon black per two hundred parts, or 0.5%), plaintiff has not persuaded the court that the use of carbon

black was misleading or deceptive to consumers in any way. The court is satisfied that inclusion of carbon black in the laboratory soil was a valid method of marking the soil to make it camera-registrable.

■ L & F also claims that P & G's decision to film several takes of the Gloves on the Bathroom Floor and Socks in the Shower commercials was false and misleading to consumers. The final versions of these two commercials were the product of several takes of the white glove/white sock test. Evidence indicated that earlier takes of the white glove test in the Gloves on the Bathroom Floor commercial provided either unsatisfactory results or results that would not be visible to the camera. Tr. 135–36, 142–43. However, the court finds nothing misleading or deceptive in P & G's decision to film more than one take of the commercials and select a take whose results were consistent with laboratory results and camera-registrable.

■ L & F also claims that the commercials trick viewers into believing that they are watching the actual cleaning competitions. During the production of the commercials, the actual cleaning of the surfaces was performed off-camera. Tr. 88–90. As discussed *supra*, L & F failed to demonstrate that the commercials convey the message that consumers are viewing the actual cleaning competitions, and has also failed to demonstrate how this perception would be material to consumers.

### 6. *The Messages Allegedly Conveyed by the Commercials*

■ L & F alleges that the commercials make several claims to consumers: (1) that Spic and Span cleaners are far superior to Lysol Basin, Tub and Tile Cleaner and Deodorizing Cleaner, (2) that Lysol Basin, Tub and Tile Cleaner and Deodorizing Cleaner "do not clean bathroom surfaces at all, or at most, hardly at all," (3) that Spic and Span obtains its cleaning results with one wipe of a washcloth, and (4) that the side cleaned with the competitor "appears clean but it isn't." Complaint ¶¶ 16, 17; Pl. Posttrial Br. at 7–8. L & F's evidence for this consists of a survey of consumer perceptions and the testimony of an expert analyzing the survey.

L & F's survey indicates that the primary message conveyed by the commercials was comparative. Tr. 186–88. That is, consumers took away from the commercials the message that Spic and Span cleaned better than the competitor. As L & F's expert acknowledged, a superiority claim, on its own, does not convey the message that another product is ineffective. Tr. 173–74.

■ P & G certainly intended the commercials to convey a message of superiority through product comparison. Pl.Exhs. 12, 13, 18. However, a single commercial can convey several different messages, including unintended messages. The court turns to L & F's consumer survey to determine what additional messages, if any, the commercial conveys.[4]

Experts who perform consumer surveys possess technical and linguistic skills that can create valuable tools to assist the courts. However, the court recognizes that experts can use these same skills to structure the language and methodology of a survey to produce the most favorable possible results for a client. Our observations about the language and structure of the survey therefore affect the weight accorded to its statistical results. As courts, particularly in this district, have become more familiar with the use of surveys in Lanham Act claims, we have also become familiar with the subtle ways surveys are structured. Those who believe they can manipulate the structure of consumer surveys to gain a tactical advan-

4. In analyzing the survey results, the court will specifically discuss the numerical results tabulated for the Socks in the Shower commercial. As tabulated by plaintiff, the Socks in the Shower commercial had the results most favorable to plaintiff's claim. Since plaintiff used the same survey for all three commercials, and since the tabulation of the surveys for each commercial was performed and presented to the court in an identical manner, the court's analysis and criticisms of the format of the surveys and of their tabulation methods applies to the surveys for all three commercials. This opinion will also refer to some of the survey results achieved for the Towels in the Steam Bath commercial, since that commercial achieved more favorable results to some questions when retabulated by the court.

tage in the courtroom may actually harm their client's strategic position before the finder of fact.

As a preliminary matter, the court notes that, through no apparent fault of plaintiff or plaintiff's expert, the commercials used in the consumer survey differed from the commercials at issue in this case. Unlike the commercials on air, the commercials shown as part of the surveys included the voiceover line "It's not clean until it's cleaned with Spic and Span." Tr. 171. The expert acknowledged that this difference might influence the survey results. The court agrees that inclusion of a spoken line that "it's not clean ..." might affect the results of a survey of consumer perceptions of cleaning effectiveness.

Question 1a of the survey asks "Aside from trying to get you to buy the product, what would you say was the main idea of this commercial." Question 1b asks "What else, if anything, did the commercial communicate to you?" and Question 1c asks "What else, if anything, did the commercial say, show or imply?" Pl.Exh. 27 at App. B. When a survey, such as this, repeats the same question three times, the finder of fact would normally attach greater weight to a respondent's first response than to a respondent's second or third response. However, the court is unable to do this since plaintiff's tabulation of the survey responses aggregates the responses to the three questions into a single category. Pl.Exh. 27 at App. F.

Repeating questions also serves the purpose of clarifying otherwise ambiguous first responses by probing the implications of previous answers. A respondent's answers to questions 1b and 1c could have been very helpful in determining what the respondent intended by an ambiguous answer to question 1a. This would have been particularly helpful in this case, since L & F believes that many ambiguous responses stand for the proposition that the other cleaner "doesn't clean or hardly cleans at all." However, the testimony of plaintiff's survey expert indicates that no effort was made to use these followup questions to clarify ambiguous responses. Tr. 155–56.

An additional criticism of the questionnaire itself is that the first question of the survey, Question 1a, commences with a statement— "Aside from trying to get you to buy the product, ..." that might arguably bias the respondent against the advertiser. Although this language may have had a modest effect on respondents, it still factors into the cumulative weight accorded to the survey results.

Plaintiff's tabulation of the answers to questions 1a, 1b and 1c states that 41.3% (158 out of 383) of the surveyed viewers of the Socks in the Shower commercial believed that a main idea of the commercial was that the other cleaner was ineffective. Exh. 27 at App. F, table 2–3.[5] However, since plaintiff aggregated the results of three questions into a single percentage, the court is unable to distinguish respondents' first answers from their second and third answers. With a sample size of 383 respondents and three nearly identical questions, there are 1149 possible total responses to the question of what the main idea of the commercial is. Table 2–3 indicates that there were 1115 total responses out of the possible total of 1149. 158 "other cleaner ineffective" responses represent only 14% of these 1115 responses. *Id.*

In addition, the court rejects plaintiff's tabulation that 41.3% of the respondents believed that the commercial conveyed the message that "the other cleaner is ineffective." A seriously troubling aspect of plaintiff's tabulation is L & F's choice of responses included in the 158 respondents allegedly stating that "the other cleaner is ineffective." For example, L & F includes in this total 101 responses that "(The Spic and Span sock/towel/glove was clean) the other sock/towel/glove was dirty," 34 responses that "Other cleaner(s) leave(s) dirt/residue/grime/scum behind ...," 9 responses that "Spic and Span cleans all the dirt the other(s) do/does not," 3 responses that "Spic and Span cleans the dirt that other(s) do/does not," 3 responses that "Other cleaner(s)

---

**5.** Towels in the Steam Bath had a 32.1% score and White Gloves on the Floor had a 13.6% score on this table.

do/does not clean all the dirt/residue/grime/scum" and 0 responses that "Spic and Span cleans dirt that other(s) leave behind." The court does not believe that these categories necessarily stand for the proposition that the other cleaner "does not clean" or "hardly cleans at all." These responses more appropriately stand for the proposition that viewers believe that Spic and Span cleans *more* effectively than the competition, or that Spic and Span cleans more tenacious stains than the competitor. Plaintiff's own witness conceded that an advertisement can depict one product as superior to a competitor without depicting the competitor as ineffective. Tr. 173–74. The president of L & F's household products division acknowledged that a cleaner that did not clean all of the dirt on a surface might still be considered effective. Tr. 42–43. These responses could also be characterized as mere observations about what has transpired on the screen, rather than implying some conclusion about the absolute effectiveness of the competition.

Plaintiff's expert failed to justify his choice of the thirteen answer categories allegedly standing for the proposition that the other cleaner is ineffective. The court believes that only seven of the answer categories,[6] with an underwhelming total of 38 responses, stand for that proposition.[7] With 383 respondents, 1115 total responses, and 1149 total possible responses, these 38 responses provide insufficient evidence for the court to find that the commercial conveys the message that the competing cleaner is ineffective. These 38 responses represent 9.9% of respondents, 3.4% of total responses, and 3.3% of total possible responses.[8] Even if the court added the 34 responses that "Other cleaner(s) leave(s) dirt/residue/grime/scum

behind ...," this would represent only 18.7% of respondents and 6.4% of total responses. And although plaintiff's complaint claims that the commercials convey the message that Lysol "do[es] not clean bathroom surfaces at all or at most hardly at all," plaintiff's expert admitted that *no* survey participant stated, in his or her own words, that the competing product shown "hardly works at all" or "doesn't work at all." Tr. 182.

Similar problems arise in the tabulated results to questions 4a ("Although you may have already mentioned it, what, if anything, did the commercial communicate to you about this other product?") and 4b ("Anything else?"). Once again, the court would normally give greater weight to the responses in question 4a than to the responses to question 4b. However, L & F chose to combine the responses to questions 4a and 4b together. Thus, the court is unable to determine the relative weight accorded to the responses.

More importantly, the court discounts the probative value of questions 4a and 4b since the wording of the question presupposes that the commercial communicates something about the other product to the consumer. Although the language of these questions were not as leading as those faced by the court in *Johnson & Johnson–Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 299–301 (2d Cir.1992), the survey's language could subtly lead consumers to make an absolute (rather than a comparative) statement about the competing product.

In addition, L & F failed to use a screening question before questions 4a and 4b that

---

6. These categories are: "Other cleaner(s) do/does not clean/work (well)/doesn't do the/a good job" (14 responses), "Other cleaner(s) may make it look clean, but it isn't" (8 responses), "Other cleaner(s) was/were no good/bad/don't buy other cleaner(s)" (7 responses), "Other cleaner(s) only half clean(s) (your tub/tiles/walls/floor)" (3 responses), "Other cleaner(s) do/does not really clean" (2 responses), "Other cleaner(s) do/does not clean completely/thoroughly" (2 responses). Lysol also notes 2 other responses falling into the miscellaneous category of "all other cleaner(s) ineffective mentions."

7. The court is unable to determine whether or not any single respondent produced more than one of these 38 responses.

8. For the Towels in the Steam Bath commercial, 40 responses fall into these seven categories. If each of these responses came from a different respondent, this represents 12.2% of the respondents, or 3.8% of the 1030 total responses to the survey for that commercial. The court notes that survey for Socks in the Shower commercial had 56 more participants than the survey for Towels in the Steam Bath, representing a 17% difference.

would have screened out respondents who did not believe that the commercial communicated anything about the competing product. Question 3, "Was a comparison made in this commercial?" allegedly a screening question for questions 4a and 4b, did not provide a useful screening. A better screening question would have been to ask whether the commercial communicated anything about the cleaning effectiveness of the other cleaner. The presence of such a screening question would have buttressed the credibility of the answers to questions 4a and 4b.

Despite their somewhat leading nature, the overwhelming number of responses to questions 4a and 4b indicated (as was the case with the answers to questions 1a, 1b and 1c) that the primary message of the commercial was comparative—that Spic and Span cleans better, or with less effort, than competing products. And as was also the case with questions 1a, 1b and 1c, the court does not agree with L & F's expansive view of the responses that stand for the proposition that "the other cleaner is ineffective." L & F's consumer survey lists fourteen different categories of survey responses, with 177 respondents, that it believes stand for the proposition that the "other cleaner is ineffective." Pl.Exh. 27 at table 5. The court believes that only eight categories, with 86 responses, stand for the proposition that "the other cleaner was ineffective." [9] And as stated previously, the court discounts the weight accorded to questions 4a and 4b due to the questions' presumption that respondents had some impression of the other cleaner, the lack of an adequate screening question, L & F's decision to aggregate answers, and the court's other observations about the conduct and format of the survey.

In addition to the open ended questions in 1a, 1b, 1c, 4a and 4b, the survey included a closed ended question, question 5.[10] The court gives much more weight to the results of the open ended questions than it gives to the results of the closed ended question. Closed ended questions narrow the universe of possible responses. In doing so, closed ended questions have the potential to divert the respondents' (and the court's) attention away from the primary message of a commercial. Question 5 presumes that a respondent has an opinion regarding the absolute (as opposed to relative) cleaning effectiveness of the competitor. The court is greatly troubled by the admission by plaintiff's witness that interviewees were not given the option of answering "don't know/have no opinion" to question 5, and that the wording of the question did not state "... how would you describe your opinion, *if any*, of the cleaning effectiveness...." Tr. 188–90. Plaintiff's expert admitted that by omitting a "don't know/no opinion" response, the survey encouraged respondents to provide an answer. Tr. 163–65, 190–91.

Despite the problems inherent in closed ended questions and the specific problems with the wording of Question 5, only 53% of the respondents (67% for the Towels in the Steam Bath commercial) stated that the competitor hardly cleans or doesn't clean at all.

---

9. The court believes that responses that "Other cleaner(s) leave(s) dirt/residue/grime/scum behind ...," (73 responses), "(The Spic and Span sock/towel/glove was clean) the other sock/towel/glove was dirty," (61 responses), "Other cleaner(s) do/does not clean all the dirt/residue/grime/scum" (15 responses), "Spic and Span cleans all the dirt the other(s) do/does not," (1 response), "Spic and Span cleans the dirt that other(s) do/does not." (1 response), and "Spic and Span cleans/gets/removes the dirt that other(s) leave behind" (0 responses) do not stand for the proposition that Lysol is an ineffective cleaner.

10. The wording of Question 5 (and the results achieved for the Socks in the Shower ad) are:
Now, based on what the commercial said, showed or implied, how would you describe your impression of the cleaning effectiveness of

... the other cleaner shown in the commercial?.... [p]lease use the card you have in front of you and select the phrase that best describes your impression as to how good a job [the product] does in cleaning....

| | |
|---|---|
| Cleans completely | 2 (.5%) |
| Cleans well | 25 (6.5%) |
| Cleans adequately | 129 (33.7%) |
| Cleans hardly at all | 155 (40.5%) |
| Does not clean at all | 48 (12.5%) |

The card on which respondents marked their answers did not offer "Don't know" or "No opinion" as an option. Despite not having this option, 8 respondents, or 2.1% of the respondents, answered "Don't know," while 16 respondents, or 4.2%, provided no answer.

This number is unconvincing when compared to the fact that 41% of respondents (but only 25% for the Towels in the Steam Bath commercial) believed that the competitor cleaned adequately or better than adequately.

After reviewing the questionnaire and its results, and having observed the testimony and cross-examination of plaintiff's and defendant's experts, the court is unconvinced that plaintiff has demonstrated that the commercials convey the message that Lysol is an ineffective cleaner to a statistically significant number of consumers. In reaching this conclusion, the court notes that: (1) the court attaches the greatest weight to questions 1a, 1b and 1c; (2) only 38 responses to the three initial open ended questions, or 9.9% of respondents, 3.4% of total responses, and 3.3% of total possible responses, support the interpretation that consumers received a message that the competing cleaner was ineffective; (3) the court is unable to determine how many different respondents were the source for these 38 responses; (4) *no* respondents to these three initial open ended questions stated, in their own words, that the competing cleaner "doesn't clean at all" or "hardly cleans at all," which is the thrust of plaintiff's complaint; (5) the survey repeats substantively identical questions several times; (6) tabulation of the survey results did not use the repeated questions to probe ambiguous answers; (7) the results of the survey aggregated the answers to separate questions, precluding the court from assigning relative weights to the responses; (8) the results of question 5 are heavily discounted due to the fact that it is a closed ended question and lacked a "don't know/no opinion" option; (9) in question 5, the ratio of "other cleaner inadequate" to "other cleaner adequate" responses was only 53% to 41% (although 67% to 25% for the Towels in the Steam Bath commercial); (10) questions 4a and 4b presumed that the commercials communicated something about the competing product to consumers; (11) minimal evidence was presented as to whether consumers recognized the competitor as Lysol; (12) the commercials shown as part of the survey differed from the commercials at issue in this case; and (13) a depiction of Spic and Span as more effective than a competing cleaner does not necessarily constitute a depiction of the competing cleaner as ineffective.

Less ambiguous statistical results might have overcome the court's reservations about the language and structure of the questions and the court's concern with the tabulation of the survey results. *See Weight Watchers Int'l v. Stouffer Corp.*, 744 F.Supp. 1259, 1273–74 (S.D.N.Y.1990). However, based on these survey results, the court finds that the commercial has not conveyed the message that Lysol is an ineffective cleaner to a statistically significant number of consumers.

■ Separately, L & F claims that the three commercials are deceptive since they each imply that Spic and Span obtains its cleaning results with merely one wipe of a washcloth. L & F presented almost no evidence that consumers received this message. The survey results do not support L & F's contention, and the court finds that the commercials do not convey this message to consumers.

■ L & F also failed to present persuasive evidence that the commercials conveyed the message that the side cleaned with the competitor "appears clean but isn't." *See* Pl. Posttrial Br. at 7. L & F's survey does not indicate that the commercial conveyed this idea. L & F argues that it does not need to demonstrate that this message was actually conveyed, since a P & G witness testified that P & G intended to use the image of "it appears clean but it isn't" to convey the superiority message. Tr. 96; *see* Pl. Posttrial Br. at 7–8. The testimony by P & G's witness does not constitute persuasive evidence of deceptive intent or of egregious conduct on the part of defendant. L & F did not convince the court that there was anything inherently deceptive about the image of a bathtub or floor appearing clean but still having hard-to-see particulate matter remaining on its surface, or that there is anything inherently deceptive about white glove tests. P & G convinced the court that it produced the commercials with good faith, and that it had a well-founded scientific basis for the claims made in the commercials. Absent evidence of deceptive intent or of egregious conduct, the witness's admission does

not relieve L & F of its burden of proving that the message of "it appears clean but it isn't" was conveyed, as L & F apparently believes. Pl. Posttrial Br. at 8.

■■■ Finally, L & F failed to demonstrate that the commercials communicated the message that the Spic and Span cleaners were "far superior" to the Lysol cleaners. Although the commercials conveyed a superiority message, the survey does not reveal a message of "far" superiority.

## DISCUSSION

A. *The Commercials' Claim Of Product Superiority For Spic and Span*

■■■ The Lanham Act prohibits deceptive visual images as well as misleading text or verbal statements. *See Coca–Cola Co. v. Tropicana Products, Inc.,* 690 F.2d 312, 314 (2nd Cir.1982). A § 43(a) claim that an advertisement is false or misleading merits relief only when the plaintiff demonstrates by a preponderance of the evidence that an advertisement is either literally false or that the advertisement, though literally true, is likely to mislead and confuse consumers. *Johnson & Johnson–Merck v. Smithkline Beecham,* 960 F.2d at 296; *McNeil–P.C.C., Inc. v. Bristol–Myers Squibb Co.,* 938 F.2d 1544, 1548–49 (2nd Cir.1991).

1. *Literal Truth or Falsity of the Advertisements*

■■■ To the extent that a virtually wordless and textless commercial can make "literal" statements, the only literal message conveyed by these commercials is that Spic and Span cleans more effectively than the competition on the surfaces shown. Plaintiff's survey fails to demonstrate that the commercials conveyed any other literal message to consumers.

■■■ A plaintiff seeking to prove literally false an advertised claim that *tests* prove defendant's product superior bears a different burden of proof than a plaintiff seeking to prove literally false a superiority claim that does not mention tests. *Castrol, Inc. v. Quaker State Corp.,* 977 F.2d 57, 62 (2d Cir.1992). Where a commercial's superiority claim does not refer to tests, a plaintiff may prove the advertisement literally false only by producing evidence that affirmatively shows the claim to be false. *Id.* at 62–63; *Procter & Gamble Co. v. Chesebrough–Pond's, Inc.,* 747 F.2d 114, 119 (2d Cir.1984). For a superiority claim that does refer to tests, in contrast, a plaintiff satisfies its burden of proof by showing that the tests referred to are not sufficiently reliable to permit one to conclude with reasonable certainty that they established the proposition for which they were cited. *Castrol v. Quaker State,* 977 F.2d at 63–64; *Procter & Gamble v. Chesebrough–Pond's,* 747 F.2d at 119.

■■■ The commercials make no explicit reference to tests or studies. Nonetheless, a commercial may imply that tests or studies support a superiority claim. For example, a product comparison performed by actors dressed as scientists on a set appearing to be a laboratory may imply that tests or studies were conducted. Plaintiffs bear the burden of demonstrating that commercials convey such implied messages. *See Johnson & Johnson–Merck,* 960 F.2d at 297–98.

■■■ L & F failed to produce persuasive evidence, such as consumer surveys, that consumers believe that the commercials depict tests or studies. *See id.* (consumer surveys are often the only method by which a court can determine a commercial's net communicative effect). The commercials make no explicit or implicit reference to tests or studies. The commercials depict product demonstrations, and do not mention the laboratory tests upon which Spic and Span bases its superiority claim. The commercials unambiguously take place in a studio, rather than in a laboratory or a simulated home, are humorous in tone, and depict demonstrations performed by actors, rather than technicians. None of these attributes are normally associated with scientific tests. These silent, highly stylized, humorous commercials, obviously staged in a studio, constitute a demonstrative visual statement that Spic and Span is superior to competitors. The court does not believe that an advertiser necessarily represents that *tests* prove superiority merely by depicting a side-by-side product demonstration. This demonstrative visual statement is

analogous to a declarative verbal statement of superiority (such as "this product left the bathtub cleaner than the other product") that makes no reference to scientific tests or studies.

 Since L & F introduced no evidence that Spic and Span's superiority claim refers to tests, the applicable burden of proof for L & F's literal falsity action is for L & F to produce evidence that affirmatively shows the superiority claim to be false. *See Castrol v. Quaker State,* 977 F.2d at 62–63; *Procter & Gamble v. Chesebrough–Pond's,* 747 F.2d at 119. As discussed *infra,* L & F has not demonstrated that Spic and Span is not superior to Lysol. In its tests, L & F's method of applying the soap scum composition produced less tenacious stains than those used in Spic and Span's tests. In addition, L & F's testing procedures and method for grading cleaning effectiveness did not allow a competing cleaner to demonstrate superiority over Lysol. Even if a competitor cleaned more tenacious stains, or cleaned stains with less effort, the best the competitor could achieve under L & F's test conditions and grading methods was a tie. L & F's tests, on their own, fail to convince the court of parity between Lysol and Spic and Span cleaners. And when the court weighs L & F's tests against the tests performed by P & G, the court is satisfied by a great preponderance of the evidence that L & F has failed to disprove Spic and Span's superiority claim.

 In the interests of a complete record, the court notes that plaintiff would not have prevailed on a literal falsity claim if the court were to consider the commercials to refer explicitly or implicitly to tests or studies. As stated *infra,* where a commercial's superiority claim refers to tests, a plaintiff satisfies its burden of proof by showing that the tests referred to are not sufficiently reliable to permit one to conclude with reasonable certainty that they established the proposition for which they were cited. *Castrol v. Quaker State,* 977 F.2d at 63–64; *Procter & Gamble v. Chesebrough–Pond's,* 747 F.2d at 119.

Here, Spic and Span's tests were sufficiently reliable to permit the court to conclude with reasonable certainty that they established Spic and Span's superiority claim. The tests were performed on a soil sample whose composition and tenacity provided a reasonable facsimile of in-home soap scum. The test conditions and grading methods did not favor one cleaner over another. Although Spic and Span's tests were not perfect, the court finds them sufficiently reliable to support the superiority claim. *See Procter & Gamble v. Chesebrough–Pond's,* 747 F.2d at 117–18, 120 (tests need not be perfect in order to support advertised superiority claim).

### 2. *Implied Falsity of the Advertisements*

 P & G's commercials present a product superiority claim through a visual side-by-side depiction of the results of a cleaning demonstration. L & F claims that various methods used in the cleaning demonstrations and in producing the commercials constitute implied falsehoods. When a plaintiff's claim rests on the implied falsity of the advertisement, rather than on the literal falsity of the advertisement, the plaintiff must demonstrate by extrinsic evidence that the challenged commercials tend to mislead or confuse consumers. *Johnson & Johnson–Merck,* 960 F.2d at 296.

 Plaintiff cites *FTC v. Colgate–Palmolive Co.,* 380 U.S. 374, 85 S.Ct. 1035, 13 L.Ed.2d 904 (1965) and several other cases arising under the FTC Act, 15 U.S.C. §§ 45 & 52, for the proposition that false or misleading demonstrations constitute false advertising under federal law. Pl. Posttrial Br. at 12. However, what constitutes false advertising under the FTC Act does not necessarily constitute a violation of § 43(a) of the Lanham Act. *See Sandoz Pharmaceuticals Corp. v. Richardson–Vicks, Inc.,* 902 F.2d 222, 227–29 (3rd Cir.1990). Unlike an action brought by the FTC under § 5 of the FTC Act, a private § 43(a) claimant must demonstrate, through extrinsic evidence, that the advertised claim tends to mislead or confuse consumers. *See Johnson & Johnson–Merck,* 960 F.2d at 297. And unlike the FTC, a § 43(a) plaintiff must establish a reasonable belief that he or she is likely to be damaged by a false advertising claim. *Id.*

■ P & G acknowledged that the commercials presented the competing product in a bottle shaped like the Lysol bottle and that the commercials used Lysol Deodorizing Cleaner as the competing product in the demonstrations. Lysol Basin Tub and Tile Cleaner and Deodorizing Cleaner are leading competitors of the three Spic and Span cleaners. P & G did not challenge L & F's ability to raise this claim on the basis of the fact that the commercials do not explicitly mention Lysol or depict the Lysol logo. Based on the arguments actually raised by the parties and on the undisputed facts before the court, L & F has demonstrated a reasonable belief that it is likely to be harmed by a false advertising claim.

■ In addition, L & F has provided extrinsic evidence that the commercials convey the message that the demonstrations were performed in a fair manner. Although not framed as such by counsel, the court understands L & F's claim that P & G used false and misleading production techniques to be in the nature of a claim that the commercials are impliedly false. That is, although the visual representation that "Spic and Span cleans the depicted surface better than the competitor" may be literally true, there is an implied representation that Spic and Span conducted the product demonstrations on a realistic and materially level playing field free from unseen devices or production techniques that would favor Spic and Span over the competition. Ordinarily, plaintiffs must present extrinsic evidence to demonstrate that an advertisement conveys any implied messages. See *Johnson & Johnson–Merck*, 960 F.2d at 297–98; *Avis Rent–A–Car Sys. v. Hertz Corp.*, 782 F.2d 381, 386 (2d Cir.1986). To establish implied messages, the court cannot substitute its own intuitive reaction for extrinsic evidence. *Johnson & Johnson–Merck*, 960 F.2d at 297–98.

L & F's survey of consumer perceptions did not specifically ask consumers whether they believed that Spic and Span performed the product demonstrations in a fair manner. However, the survey results necessarily imply that consumers believed that Spic and Span performed the demonstrations in a fair manner. The survey demonstrates that the overwhelming message conveyed by the commercials was that Spic and Span cleans better than the competitor. In order for consumers to accept the demonstrations' message of superiority, the consumers must necessarily have believed that Spic and Span performed the demonstrations in a fair and even manner.

Given this necessary implication from the extrinsic evidence, L & F has demonstrated that the Lanham Act provides a basis for its "level playing field" argument. However, the court finds nothing false or misleading in the methods and techniques used by P & G or Saatchi & Saatchi to produce the commercials.

■ Although the actors in the Towels in the Steam Bath commercial did use different motions to rub their towels against the seats of the steam baths, the court was not satisfied by a preponderance of the evidence that this difference in cleaning motions would cause a meaningful disparity in the quantity of soap scum residue picked up by the towels. With respect to the other two commercials, L & F did not dispute that P & G performed the white glove and white sock tests with equal effort. L & F also did not demonstrate that P & G performed the off-camera cleaning competition in an unequal manner. The court also does not believe that P & G violated the Lanham Act merely because it chose to film several takes of the commercials in order to gain camera-registrable results consistent with its previous laboratory tests.

■ In addition, the court finds nothing misleading or deceptive in the commercials' use of a small amount of carbon black in its soap scum composition to make the cleaning of the all-white surfaces camera-registrable. Testimony established that neutral bodies who create testing standards have suggested that carbon black be used in laboratory soap scum compositions, and that carbon black can be part of normal bathroom soap scum stains.

L & F's criticisms of P & G's soap scum formulation and of P & G's method of simulating tenacity failed to persuade the court of anything misleading. P & G's method of

baking the soap scum composition onto the surface to be cleaned provides a realistic method of simulating the tenacity of in-home soap scum. Similarly, the soap scum composition used by P & G in its laboratory tests and in the commercial is a reasonably realistic recreation of typical in-home soap scum. P & G developed this formulation after extensive research that the court found highly persuasive.

To summarize, the court finds that P & G's soil composition and test conditions contained no deceptive devices or unfair procedures, and that Spic and Span's test conditions and soil compositions are representative of actual household soap scum. Plaintiff failed to demonstrate anything materially false or misleading in the methods and techniques used to produce the commercials.

B. *The Commercials' "Claim" that Lysol is an Ineffective Cleaner, and Other Messages Allegedly Conveyed by the Commercials*

 L & F also claims that the commercials convey other messages, most notably that Lysol cleaners are ineffective. L & F's consumer survey evidence fails to establish that the commercials convey the message that Lysol is an ineffective cleaner to a statistically significant number of consumers. The court finds that the raw data produced by the survey failed to establish a message of ineffectiveness, and additionally finds that plaintiff's presentation of the survey procedures, language, and tabulation of statistical results undermines the credibility and weight attached to the relevant data. *See Johnson & Johnson–Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*, 1991 WL 206312, at *6–*9 (S.D.N.Y.) (Oct. 1, 1991) (discounting probative value of survey results since questions were suggestive and repeated, and since expert performed overinclusive tabulation of results), *aff'd*, 960 F.2d 294; *Warner–Lambert Co. v. Schering–Plough Corp.*, 1991 WL 221107 (S.D.N.Y.) (Oct. 15, 1991) (unreliability of closed ended survey questions that limit respondents' answers).

 The court further notes that plaintiff has not demonstrated that Spic and Span "intentionally set out to deceive the public" through "deliberate conduct of an egregious nature." *See Resource Developers, Inc. v. Statue of Liberty–Ellis Island Foundation, Inc.*, 926 F.2d 134, 140 (2d Cir. 1991). A finding of deceptive intent justifies a presumption that consumers are actually being deceived, relieving plaintiff of its burden of producing consumer survey evidence and shifting the burden of proof to defendant to demonstrate lack of consumer confusion. *Id.* P & G had a good faith belief in the validity of the superiority claims made in the commercials, and P & G based this belief on well-founded tests and scientific analysis. Even had plaintiff shown deceptive intent (which it failed to do), the court's examination of L & F's consumer survey would have satisfied defendant's burden of demonstrating lack of actual consumer confusion.

In the interests of a complete record, the court notes that L & F's tests failed to convince the court that Lysol is effective when used against P & G's more tenacious and more realistic soap scum composition. L & F did not present any evidence of the relative cleaning ability of Lysol Floor Cleaner, and thus cannot maintain a claim of product parity for Lysol Floor Cleaner. With regard to Lysol Deodorizing Cleaner and Lysol Basin, Tub and Tile Cleaner, as discussed *infra*, P & G has developed a soap scum composition representative of actual in-home soap scum. In addition, P & G's method of simulating the tenacity of soap scum stains on bathroom surfaces produces stains more tenacious than those used in L & F's tests, and the court finds that P & G's soap scum composition to be a more realistic facsimile of the soap scum stains actually found in showers and tubs than that used by Lysol.

L & F also failed to demonstrate that the commercials convey the message that Spic and Span achieves its cleaning results with one wipe, nor did plaintiff satisfy its burden of proof of demonstrating that the commercials convey the message that surfaces cleaned with the competing cleaner appear clean, but are really dirty.

Plaintiff has also failed to demonstrate that consumers believe that they are watching the actual cleaning process. L & F's consumer

survey does not indicate that consumers believed that they were viewing the actual cleaning competition, nor did L & F introduce any other persuasive evidence that the commercial conveyed this impression. Even assuming that the commercials did imply that they depicted the actual cleaning efforts, L & F has failed to demonstrate how this perception would be material to a consumer.

### C. *Denial of Preliminary Injunctive Relief*

At the conclusion of the trial, plaintiff moved for a preliminary injunction against further broadcasts of the commercials. Ruling from the bench, the court denied the motion. Having observed the witnesses and exhibits presented by the parties at trial, the court believed that plaintiff had demonstrated neither a likelihood of success on the merits nor a balance of hardships tipping decidedly in plaintiff's favor. *See Castrol v. Quaker State*, 977 F.2d at 62. This opinion summarizes the court's reasons for believing that plaintiff had not demonstrated likelihood of success on the merits. The court further notes that the fact that defendant was broadcasting two of these commercials as an integral part of the product launch of two new consumer products, introduced to a highly competitive market only months before, tipped the balance of hardships strongly in favor of the defendant.

### D. *Plaintiff's State Law and Common Law Unfair Competition Claims*

The findings of the court *infra* fail to support plaintiff's claim under either New York General Business Laws §§ 349–350 or under common law unfair competition principles. Plaintiff has failed to demonstrate any act or practice that was misleading to consumers. *See Coors Brewing Co. v. Anheuser–Busch Cos.*, 802 F.Supp. 965, 975 (S.D.N.Y.1992) (§§ 349–350 claims). Nor has plaintiff proven the elements of a product disparagement claim, having failed to demonstrate either a false statement, malice or special damages. *See Fashion Boutique, Inc. v. Fendi USA, Inc.*, 1992 WL 170559 (S.D.N.Y.) (July 2, 1992).

### CONCLUSION

The complaint is dismissed in its entirety. *See* JPTO, Undisputed Facts ¶ 7. This Opinion and Order constitutes the court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

SO ORDERED.